## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CASE NO. 2:24-CR-63** |
| **v.** | **JUDGE WATSON** |
| **OMORUYI O. UWADIAE** | **Sentencing Memorandum of the United States** |

The United States hereby submits its Sentencing Memorandum with respect to Defendant Omoruyi O. Uwadiae. Mr. Uwadiae has one unresolved objection, which the United States opposes. For the reasons that follow, a total sentence of 63 months of imprisonment, 3 years of supervised release, and a $7,500 fine would be sufficient but not greater than necessary to achieve the statutory goals of sentencing.

## BACKGROUND

For several months in 2019, Defendant Omoruyi O. Uwadiae committed several crimes targeting gay and bisexual men. Mr. Uwadiae harassed, cyberstalked, extorted, and stole the identities of his victims. Mr. Uwadiae repeatedly requested sexually explicit photos and videos from other men. When they complied, he used those images—which were private and not intended to be shared with anyone else—to extort and harass the men and their families. Specifically, Mr. Uwadiae threatened to release the photos and videos if the men did not comply with his demands, including demands for money and sex. He carried out those threats by sending the explicit material to the victims' family members and other people close to the victims, and also by posting the material online for the whole world to see.

On April 22, 2024, the United States Attorney filed an Information, which charged Mr. Uwadiae with 8 counts of Cyberstalking, in violation of 18 U.S.C. §§ 2261A(2) and 2261(b)(5); 7 counts of Interstate Communications with Intent to Extort, in violation of 18 U.S.C. § 875(d);

and 7 counts of Unlawful Transfer, Possession, or Use of a Means of Identification, in violation of 18 U.S.C. §§ 1028(a)(7), (b)(2), (c)(3)(A). (Information, R.2 at 3–14.)

On the same day, the Parties filed a Plea Agreement, in which Mr. Uwadiae agreed to plead guilty to all the counts of the Information. (Plea Agreement, R.3 at 17.) The Parties stipulated to multiple guidelines agreements. (*Id.* at 19–20.) Additionally, Mr. Uwadiae agreed to forfeit certain property and to pay restitution to the victims of his crimes. (*Id.* at 20–22.) The Plea Agreement contained a lengthy Statement of Facts. (*Id.* at 25–28.)

On May 22, 2024, Mr. Uwadiae offered his guilty pleas before Magistrate Judge King. On June 7, 2024, the Court entered an order formally accepting the guilty pleas. (Order, R.15.) The Probation Officer released the Final Presentence Investigation Report on September 16, 2024. (PSR, R.20.) Sentencing is scheduled for December 17, 2024.

## ARGUMENT

The Probation Officer calculated that Mr. Uwadiae's Total Offense Level is 24 and that his Criminal History Category is I. PSR ¶¶ 128, 132. The Probation Officer correctly noted that these calculations would result in advisory guidelines ranges of 51 to 63 months of imprisonment, a fine of $20,000 to $200,000, and supervised release of 1 year on Counts 9–15 and 1 to 3 years on all other counts. PSR ¶¶ 165, 170, 171, 179.

The United States will first address Mr. Uwadiae's objection, and then will turn to the sentencing factors outlined in 18 U.S.C. § 3553(a).

## I. The Probation Officer correctly determined that the vulnerable-victim upward adjustment should be applied as to two of Mr. Uwadiae's victims.

In a letter dated August 29, 2024, Mr. Uwadiae objected to the application of the vulnerable-victim upward adjustment in calculating the guidelines range as to two victims. (Defendant Objection Letter, R.20-2 at 144–45.) Relatedly, Mr, Uwadiae also objected to the

denial of the Zero Point Offender reduction under U.S.S.G. § 4C1.1. (*Id.* at 145.) The United States opposes the objections because the Probation Officer correctly applied the vulnerable-victim adjustment.

The sentencing guidelines provide that a defendant's offense level should be increased by two levels if he "knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b). Application Note 2 to the guideline specifies that a victim of the offense is vulnerable when he is "unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." Whether this adjustment applies directly affects the applicability of the Zero Point Offender reduction. Section 4C1.1 provides that the Zero Point Offender reduction applies only if "the defendant did not receive an adjustment under § 3A1.1 (Hate Crime Motivation or Vulnerable Victim)." U.S.S.G. § 4C1.1(a)(9). The Parties agree that the Zero Point Offender reduction would not apply if the objection were to be overruled. (*See* Defendant Objection Letter, R.20-2 at 145.)

In this case, the PSR applies the vulnerable-victim adjustment (1) for the count groups related to Victims 1 and 5 because those victims were not out as gay or bisexual to their families, and (2) for the count group related to Victim 1 because he was a minor. *See* PSR ¶¶ 67, 96.

Courts have applied the vulnerable-victim adjustment where a defendant has taken advantage of a victim's particular desire not to have his sexual behavior disclosed due to a fear of the reaction of others. For example, the Seventh Circuit affirmed the application of the vulnerable-victim adjustment when a defendant secretly videotaped the same-sex sex act of a man who was married to a woman, and then blackmailed the victim by threatening to disclose the video of the sex act. *United States v. Lallemand*, 989 F.2d 936, 937, 939–40 (7th Cir. 1993), *abrogated on other grounds by United States v. Vizcarra*, 668 F.3d 516 (7th Cir. 2012); *see also*

*United States v. Singh*, 54 F.3d 1182, 1191 n.4 (4th Cir. 1995) (citing *Lallemand* with approval).

The court reasoned that the defendant had purposely targeted the victim because "[s]ecrets

concerning sexual behavior are among the secrets that people often want very much to

conceal." *Id.* at 939. The defendant is able to "exploit a position of unusual leverage" when the

sexual behavior is activity that the victim's family or friends "may consider deeply shameful,

disgraceful, abnormal, or vicious." *Id.* at 940. Although public attitudes about gay and bisexual

people have changed since *Lallemand* was decided, the case's principles still apply at least where

a victim is particularly concerned about the private reactions of other individuals to the victim's

sexual orientation.

Similarly, a district court applied the vulnerable-victim adjustment to defendants who

fraudulently inflated the debt of users of telephone sex lines. *United States v. Miller*, 871

F. Supp. 232, 235 (E.D. Pa. 1994). The defendants purchased credit card debt of users of phone

sex lines and demanded that the debtors pay off more debt than the users had in fact accrued. *Id.*

at 233. When victims refused to pay, the defendants threatened to tell their spouses and, in some

cases, threatened to reveal that they had used a gay phone sex line, regardless of whether that

was true. *Id.* The court concluded that this class of debtors was particularly vulnerable to the

fraud scheme because "many people who use phone sex lines will, unlike users of non-sex-

related phone lines, have a particular desire to keep that use private." *Id.* at 235. Without

comment, the Third Circuit affirmed. *See United States v. Miller*, 74 F.3d 1229 (3d Cir. 1995)

(unpublished table decision).

Here, the same principles apply. As the PSR correctly concluded, Victims 1 and 5 were

"particularly susceptible" to Mr. Uwadiae's offenses because Mr. Uwadiae knew they had not

revealed their sexual orientations to their families. *See* PSR ¶¶ 67, 96. Vulnerability is relative to

4

the nature of the crime. Gay and bisexual men who are not out to their families have a particular interest in keeping that information private, and therefore are particularly susceptible to cyberstalking and extortion schemes targeting sexual orientation, like Mr. Uwadiae's.

Mr. Uwadiae's actions reinforce that he knew that these victims were particularly susceptible to his crimes. After he made Victim 1's images public, he contacted one of the victim's family members and asked, "So did everyone find out that [Victim 1] is gay?" PSR ¶ 24. He asked for details about family's reactions, including "Did they disown him?", "Is he going to gay conversion therapy?", and "Tell his dad to text me, I wanna know what he thinks about his son riding dick." *Id.* Mr. Uwadiae also knew that Victim 5 was particularly susceptible to his crimes. Victim 5 told Mr. Uwadiae that he was going to call his parents and tell them he loved them before Mr. Uwadiae shared sexually explicit photographs of him, because he feared his parents might never speak to him again. PSR ¶ 35. Mr. Uwadiae knew of, and took advantage of, the vulnerability of these victims.

The vulnerable-victim adjustment also applies to the count group related to Victim 1 because Victim 1 was a minor at the time of Mr. Uwadiae's criminal activity. *See* U.S.S.G. § 3A1.1 app. n.2 (specifically mentioning "age" as one of the characteristics that might make a victim "unusually vulnerable"). When Mr. Uwadiae and Victim 1 first communicated, Victim 1 told Mr. Uwadiae that he was 18 years old, when in fact he was 17. PSR ¶ 22. Shortly after Mr. Uwadiae began distributing sexually explicit images of Victim 1 to the victim's loved ones, members of the victim's family told Mr. Uwadiae that he was 17. PSR ¶ 23. As Mr. Uwadiae admitted in the Statement of Facts, "[b]y at least April 2, 2019, Mr. Uwadiae knew and acknowledged that Victim 1 was a minor." (Plea Agreement, R.3 at 26; *see* PSR ¶ 23.) On that

day, Mr. Uwadiae told another individual, "Damn the fucker is underage. THIS is why I usually don't mess with guys younger than me. He was an exception but he fucking lied."

Undeterred by the consequences of distributing sexually explicit images of a minor, Mr. Uwadiae continued to widely distribute such images of Victim 1. On July 13, 2019—102 days after he had acknowledged the victim's true age—Mr. Uwadiae created a publicly viewable Facebook page that showed Victim 1's face as he engaged in sexual activity with another male. (*Id.*) On September 14, 2019, Mr. Uwadiae sent sexually explicit images of Victim 1 to Victim 1's mother and others. (*Id.*) The images he sent were created when Victim 1 was a minor. When he distributed the sexually explicit images, Mr. Uwadiae was 23 years old—6 years older than his victim. PSR ¶ 133.

The PSR correctly concludes that, as a minor, Victim 1 was particularly susceptible to Mr. Uwadiae's crimes. A minor—particularly one who was still in high school—may reasonably fear more harm from the disclosure of his sexual orientation to his parents than an adult would fear. Also, a younger person has necessarily developed a sexual orientation more recently and therefore may be particularly susceptible to an older offender manipulating him on the basis of his sexual orientation.

The PSR correctly found that Victims 1 and 5 were particularly vulnerable to Mr. Uwadiae's crimes and that he knew about and preyed on these vulnerabilities. No change to the PSR is warranted.

For his part, Mr. Uwadiae offers two reasons why the adjustment should not apply. First, he identifies that "unawareness of sexual orientation is not listed as a basis" for the adjustment. (Defendant Objection Letter, R.20-2 at 145.) True, but irrelevant. Although the application note to the guideline identifies *representative* examples of what might make a victim vulnerable, the

6

list is not exclusive. Instead, the application note says the guideline applies to a victim who is unusually vulnerable due to those listed examples "or who is *otherwise* particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1 app. n.2 (emphasis added).

Second, Mr. Uwadiae contends that vulnerability is inherent in his crimes. (Defendant Objection Letter, R.20-2 at 145.) As the Seventh Circuit has stated, however, even though all extortion victims have a secret they want to keep private, "[b]lackmail victims are not all susceptible to the same degree." *Lallemand*, 989 F.2d at 940. For the reasons explained earlier, Victims 1 and 5 are vulnerable victims. The objections should be overruled.

## II.    The United States recommends a term of imprisonment of 63 months.

Considering the factors in 18 U.S.C. § 3553(a), the United States recommends a total sentence of 63 months in prison, which is the top of the advisory guidelines range. This would entail sentencing Mr. Uwadiae to 60-month prison terms on each of Counts 1–8 and Counts 16–22, and 24-month prison terms of each of Counts 9–15, to run partially consecutive. *See* U.S.S.G. § 5G1.2(b), (c); PSR ¶ 166. The United States also recommends a term of supervised release of 3 years and a $7,500 fine.

*Nature and circumstances of the offenses.* Mr. Uwadiae engaged in the widespread online harassment and extortion of victims all over the United States. PSR ¶¶ 18–19. He extorted or attempted to extort dozens of gay and bisexual men by demanding money, sex, or statements from the men in exchange for not revealing their sexual orientations or not harming their reputations. *Id.* Mr. Uwadiae commonly carried out his threats. PSR ¶ 20.

During the time of his criminal activity, Mr. Uwadiae lived in the Seattle area. PSR ¶ 21. He worked for Procter & Gamble and regularly traveled for work. *See* PSR ¶¶ 18, 156. He traveled to the Southern District of Ohio for work and because his family lived here. *See* PSR

7

¶¶ 21, 133–34. When he traveled, he met gay and bisexual men online, including on Grindr, a social networking and dating app that describes itself as being "for gay, bi, trans, and queer people." PSR ¶ 19. Mr. Uwadiae requested and commonly received sexually explicit photographs and videos from the men he met online. *Id.*

If the men stopping communicating with Mr. Uwadiae or otherwise took actions that upset him, Mr. Uwadiae threatened to harm the men by distributing their sexually explicit photographs and videos. *Id.* He also obtained personal information about them, such as their names, places of work, and information about their friends, family members, coworkers, and acquaintances. *Id.* He threatened to spread the images widely on the internet and threatened to send the images directly to the victims' friends, family members, employers, and others. *Id.* These threats were part of an extortion or "sextortion" scheme. Mr. Uwadiae used the threats to demand money from some victims. *Id.* From other victims, he demanded they meet him, have sex with him, or make damaging admissions, such as admissions that the victims were racist. *Id.*

These were not idle threats—Mr. Uwadiae often carried through. PSR ¶ 20. He sent sexually explicit photographs and videos of the men without their consent to people who knew the victims, including parents and siblings. *Id.* He also spread the images widely, repeatedly doing so by means of identity theft. *Id.* He used the victims' personal identifying information to create false accounts on social media and to post personal information about the victims. *Id.*

Mr. Uwadiae's extortion scheme caused substantial emotional distress to several of his victims. At least two victims had not publicly disclosed their sexual orientations, and Mr. Uwadiae's actions disclosed these victims' sexual orientations, contrary to the victims' wishes. PSR ¶¶ 67, 96. The Victim Impact Statements show the trauma that Mr. Uwadiae caused and the ongoing effects the crimes have had in the victims' lives. *See* PSR ¶¶ 44–53.

8

Most disturbingly, Mr. Uwadiae harassed Victim 1, who was a minor at the time of Mr. Uwadiae's criminal acts. PSR ¶ 22. In March 2019, Mr. Uwadiae and Victim 1 started communicating with each other using Snapchat. *Id.* On April 1, 2019, Mr. Uwadiae asked for sexually explicit images, and Victim 1 complied. *Id.*

At some point, Victim 1 blocked Mr. Uwadiae on Snapchat. *Id.* In response to that perceived slight, Mr. Uwadiae demanded that Victim 1 pay him money in exchange for not sharing the sexually explicit images with Victim 1's family and friends. *Id.* Mr. Uwadiae made the demands through phone calls and text messages using several different numbers. PSR ¶ 44. Mr. Uwadiae threatened him nonstop. *Id.* Victim 1 had a serious physical and mental reaction to Mr. Uwadiae's threats, and he begged Mr. Uwadiae to stop. *Id.*

When Victim 1 refused to pay, Mr. Uwadiae began distributing the explicit images to multiple individuals, including Victim 1's family members, friends, and classmates. PSR ¶ 23. Mr. Uwadiae also sent the images to the victim's brother's friends, to mere acquaintances, and even to people connected to Victim 1 but with whom Victim 1 had never had conversations. PSR ¶ 44. He also created a publicly viewable Facebook page where the profile photo depicted Victim 1's face as he engaged in sexual activity with another male. PSR ¶ 23.

Early on in their communications, on April 2, 2019, Mr. Uwadiae acknowledged that Victim 1 was a minor. *Id.* That did not deter him from sharing the sexually explicit images of Victim 1. On July 13, 2019, Mr. Uwadiae created a publicly viewable Facebook page with a variation on Victim 1's name that depicted Victim 1's face as he engaged in sexual activity with another male. *Id.* On September 14, 2019, Mr. Uwadiae sent sexually explicit images of Victim 1 to Victim 1's mother and others. PSR ¶¶ 25–26. He took these acts knowing that Victim 1 was a minor. PSR ¶ 23.

9

Mr. Uwadiae's harassment and extortion of adult victims followed a similar pattern. He posted several victims' intimate images online. He posted Victim 2's sexually explicit videos and photographs—along with his name, home city, and Instagram handle—on Male General, a publicly available blog marketed to gay men containing boards where users can post images and text. PSR ¶ 28. Mr. Uwadiae demanded $200 to take down the post. *Id.* He also posted nude photographs and identifying information of Victim 4 on Male General. PSR ¶ 33. Similarly, he created fake social media accounts using photos of Victim 5. PSR ¶ 34. Mr. Uwadiae told Victim 5 that the cost of taking down the accounts was $200 or allowing Mr. Uwadiae to watch him masturbate. *Id.* Mr. Uwadiae engaged in similar harassment of Victim 8. PSR ¶ 40.

Mr. Uwadiae also sent intimate information about Victim 6 to a Twitter account called "Flakes Exposed" for the account to post. PSR ¶ 37. Specifically, he sent Victim 6's full name, cell phone number, and city of residence; true photos of Victim 6; and a photo of male genitals that were attributed to Victim 6. *Id.* Mr. Uwadiae initially demanded $200 to have the post taken down, and then increased the demand to $500. *Id.* He also threatened to print nude images of Victim 6 and post them around Victim 6's apartment complex. *Id.*

Additionally, Mr. Uwadiae distributed explicit images of others in a targeted fashion. He sent nude photographs of Victim 3 to Victim 3's sister. PSR ¶ 29. He also sent nude photographs of Victim 4 to at least one of Victim 4's family members. PSR ¶ 32. He threated to send intimate photos of Victim 7 to a list of several names if Victim 7 did not buy $500 in gift cards for him. PSR ¶ 39.

The eight victims referenced in the charging instrument represent only a fraction of Mr. Uwadiae's total victims. The Information charges acts related to only eight men due to venue limitations, but Mr. Uwadiae admitted in an interview that he would not be surprised if

10

investigators identified 50 to 100 victims. PSR ¶ 42. Investigators were able to confirm a total of 40 victims and have identified another 31 likely victims. *Id.*

This form of activity, which combines cyberstalking, extortion, and identity theft, disrupts the lives of and instills fear in victims. That is not just the effect of the crimes—it is the point. Mr. Uwadiae's crimes were not about making money from extortion payments. At the time of the criminal activity, he earned $110,000 annually, and last year he earned nearly double that. PSR ¶¶ 155–56. He has a substantial net worth, especially for a 29-year-old. PSR ¶ 158. Instead, he meant to generate fear and paranoia. As he told the Probation Officer, he perpetrated his offenses out of a desire to control others. PSR ¶ 55. These serious offenses, motivated by a desire to cause distress to and control others, warrant a sentence at the top of the guidelines range.

*Need to afford adequate deterrence.* The sentence should afford specific deterrence to Mr. Uwadiae. Throughout his criminal activity, he was cavalier about the harm he was causing. After acknowledging that Victim 1 was under 18, he continued to possess and distribute sexually explicit images created when Victim 1 was a minor. PSR ¶¶ 23–26. He even told a family member of Victim 1, "I get he's a minor but I don't really see it as wrong that I'm sending it." PSR ¶ 27.

Mr. Uwadiae delighted in the discomfort, anxiety, and pain he inflicted on others. He taunted his victims and their families. *See, e.g.*, PSR ¶¶ 23–27, 35. When Victim 5 told him that sharing his explicit images would out him as bisexual to his parents, who would not approve, Mr. Uwadiae callously replied, "Yeaaa I don't care." PSR ¶ 35.

Despite all this, Mr. Uwadiae claimed in his interview with the FBI that he somehow did not recognize that his actions were criminal, and instead characterized the actions as "mischief"

11

and attention-seeking behavior. PSR ¶ 41. He also claimed to the Probation Officer that he did not realize his conduct was criminal. PSR ¶ 55. His lack of recognition that his sadistic behavior was criminal is a sign that specific deterrence is an important consideration in this case.

Specific deterrence is also required based on Mr. Uwadiae's violations of his conditions of pretrial release. One of his conditions of release was that his use of computers and the internet was restricted to necessary purposes approved by Pretrial Services. PSR ¶ 15. Pretrial Services installed computer-monitoring on his device. *Id.* Within a month of his release on conditions, Mr. Uwadiae violated these conditions multiple times. PSR ¶ 16. He accessed Reddit, Instagram, Pinterest, Etsy, and Tumblr. *Id.* Most concerningly, he searched Google for "modded Roku," which is a device that allows a user to access third-party applications on a Roku device. *Id.* Possessing a modded or modified Roku would allow Mr. Uwadiae to circumvent the monitoring software. *Id.* This recent activity suggests that specific deterrence is a necessary component of the Court's sentence.

The sentence should also afford general deterrence to others. The ever-growing reach of the internet make it easy for one person to enter another person's life in frightening ways and cause substantial damage. Others must be deterred from engaging in similar behavior.

*History and characteristics of the defendant.* Nothing in Mr. Uwadiae's history and characteristics mitigates his criminal conduct. He has enjoyed privileges unknown to most defendants who appear before the Court. His father is a journalist, and his mother is a registered nurse. PSR ¶ 133. Mr. Uwadiae comes from an intact family, and the PSR reports "good relationships with his parents and sister." PSR ¶ 134. Although Mr. Uwadiae started his life in a small apartment in Nigeria, the family moved to London and then to Columbus. PSR ¶ 133, 135, 137. He "excelled" in school and college, including graduating *cum laude* from Ohio State and

12

earning an MBA from Northwestern. PSR ¶¶ 140, 153–54. These advantages make his criminal activity hard to understand.

Mr. Uwadiae's physical and mental health also do not explain his actions. He is in good physical health, and his mental health issues appear to have arisen only after the FBI executed a search warrant at his home. PSR ¶¶ 143–50. Mr. Uwadiae told the Probation Officer that "the instant offense and the FBI search warrant" are what "led to him seeking mental health treatment." PSR ¶ 144. He appears to display symptoms of depression and anxiety, PSR ¶¶ 147–49, though the record does not support a conclusion that these conditions pre-dated his criminal activity. In other words, any mental-health issues he is currently experiencing do not explain his criminal activity or mitigate his culpability. In addition, although he has engaged in mental-health counseling starting after the FBI search warrant, Mr. Uwadiae mentioned to a counselor that one of his motivations for participating in therapy was that it would look good to the Court. PSR ¶ 148. This comment does not give confidence that he is earnestly engaged in his rehabilitation.

*Need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.* In his Sentencing Memorandum, Mr. Uwadiae "implores" the Court to "consider the punishment already received," which he describes as his family shame, his loss of good-paying employment, and the likelihood that he will never have as good a job in the future. These are not proper considerations under the § 3553(a) factors. The Sixth Circuit has made clear that the collateral consequences of conviction are "impermissible factors" in sentencing a defendant. *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013). That is because Section 3553(a) requires that "the *sentence* imposed . . . reflect the seriousness of the offense," and "none of" these collateral consequences are Mr.

13

Uwadiae's "sentence." *United States v. Bistline*, 665 F.3d 758, 765 (6th Cir. 2012) (emphasis in original) (quoting 18 U.S.C. § 3553(a)(2)(A)). The stigma of Mr. Uwadiae's convictions is inherent in every felony prosecution, regardless of sentence. Beyond that, consideration of these consequences would create unseemly results. Consideration of collateral consequences like loss of a six-figure job "would tend to support shorter sentences in cases with defendants from privileged backgrounds, who might have more to lose along these lines." *Id.* at 765–66. Because Mr. Uwadiae's conviction-is-enough argument is a misapplication of § 3553(a)(2), the Court should reject his request for leniency based on the collateral consequences of his convictions.

## CONCLUSION

For the above reasons, a total sentence of 63 months of imprisonment, 3 years of supervised release, and a $7,500 fine would be sufficient but not greater than necessary to achieve the statutory goals of sentencing.

> **Respectfully submitted,**
>
> KENNETH L. PARKER
> United States Attorney
>
>
> s/ Peter K. Glenn-Applegate
> PETER K. GLENN-APPLEGATE (0088708)
> HEATHER A. HILL (0100920)
> Assistant United States Attorneys
> 303 Marconi Boulevard, Suite 200
> Columbus, OH 43215
> Phone No.: (614) 469-5715
> Fax No.: (614) 469-5653
> Email: peter.glenn-applegate@usdoj.gov
> Email: heather.hill@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Sentencing Memorandum of the United

States was filed with the Court's CM/ECF filing system and served on all parties on record this

10th day of December, 2024.

s/Peter K. Glenn-Applegate
PETER K. GLENN-APPLEGATE (0088708)
Assistant United States Attorney